(648 P.2d 249)

No. 52,771

State of Kansas, *ex rel.,* Sheila Hausner, and Simon Hausner, by and through his mother and next friend, Sheila Hausner, *Appellees,* v. Paul Blackman, *Appellant.*

Petition for review granted September 17, 1982.

Opinion filed July 15, 1982.

*Louis S. Wexler,* of Wexler, Wingfield and Zemites, of Shawnee Mission, for appellant.

No appearance by appellees,

Before Foth, C.J., Rees and Spencer, JJ.

Rees, J.: This is a paternity action. A jury found defendant to be the father of the child. Defendant appeals.

The initial issue on appeal is whether evidence concerning paternity exclusion blood testing was erroneously admitted to prove the single question in this case, that is, whether the defendant is the biological father of the child.

"In paternity exclusion testing, the presence or absence of certain genetically controlled factors ['markers'] in the blood of the mother, child(ren), and alleged father(s) is determined. The patterns obtained are evaluated utilizing well-defined laws of inheritance to establish whether or not the genetic makeup of the alleged father would preclude his being the true father of the child in question.

"The term exclusion means it is genetically impossible for the alleged father to be the true biological father. Exclusions are of two general categories: direct exclusions and indirect exclusions. In direct exclusions, the child possesses a factor not present in either the mother or the alleged father. Since the factor was inherited from one of the child's parents and it was not inherited from the mother, it had to have been inherited from the father. But because the alleged father does not have the factor, another man must be the child's father. In indirect exclusions,

the child does not possess a factor which the alleged father must contribute to his children." Stroud, Bundrant and Galindo, *Paternity Testing: A Current Approach*, 16 Trial 46 (Sept. 1980).

The challenged evidence is the testimony of plaintiff's expert witness, Malcolm L. Beck, a serologist who took and analyzed samples of blood of the child, his mother and defendant. The entire material testimony of the witness was as follows:

"Q. . . . Mr. Beck, tell me what you do, generally, or what happens generally after a blood sample is taken.

"A. For the purpose of paternity testing?

"Q. Yes, sir.

"A. I take blood samples from each of the individuals. These samples are then tested for 'S' series of inheritable factors within a series of blood group systems. I then analyze the results to see whether these are consistent or not with paternity.

"Q. And did you do that, sir . . . in this instance . . . .

"A. Yes, I did.

"Q. What examination did you make of the test results?

"A. I performed the tests myself, I analyzed the results and the conclusion I came to was that it was not possible to establish non-paternity in this case.

"Q. Now, is it possible with the kind of test that you did to establish paternity to a reasonable medical [certainty]?

"A. With this particular series of tests, this would be limited.

"Q. And what is the percentage or percentile or whatever on the type of test that you performed, Mr. Beck?

"A. In this particular series of tests I would anticipate an exclusion rate in the order of about seventy percent.

"Q. That is seven out of ten men you could exclude as possible fathers of this child involved?

"A. Given ten men falsely accused of a paternity, I could exonerate about seven of them.

"Q. Now, at the time that [the defendant and the mother] and the attorneys were there, did you make available or explain some further kind of tests that were available?

"A. It is always my practice to point out that with this particular series of tests we are limited to the seventy percent exclusion rate and I point out that if we can't arrive at a decision then, I would recommend that further testing be done to raise the level of exclusion in excess of ninety percent. This is a recommendation of the American Medical Association, American Bar Association Joint Report on Paternity Testing.

"Q. And what kind of test is this that is available to raise the exclusion rate to . . . ninety percent?

"A. There is another series of inheritable factors that can be tested for. These are red blood enzymes and a series of serum proteins.

. . . . .

"Q. Were you referring to a Human Lucocyte [Antigen] Test?

"A. No, I wasn't.

"Q. You have one that is more scientific than the H.L.A. test?
"A. Not more scientific, as good as H.L.A. testing.

. . . . .

"Q. Basically, all you were able to determine from your tests . . . was that it was not possible to establish that [the defendant] was not the father?
"A. Indeed.

. . . . .

"Q. You were able to establish that [the defendant] might be the father but you could not exclude him as the father, is that what you are saying?
"A. I was able to establish that I could not exclude him."

"One of the most prevalent confusions in paternity testing is the difference between the meanings of the terms 'probability of exclusion' and 'likelihood of paternity.' *Probability of exclusion is the probability that the tests employed will exclude a falsely accused man.* For example, if the probability of exclusion with the tests employed is 95 percent, of 100 *non-fathers,* 95 will be excluded and five will not be excluded. If the probability of exclusion with the tests employed is 95 percent and no exclusion is obtained, either the alleged father is the true father *or* he is one of the five out of 100 *non-fathers* that the tests would not exclude. Another way of stating this is that there is a five percent chance that the alleged father is not the true father, but the tests used would not exclude him.

"This does *not* mean that there is a 95 percent chance that the alleged father is the true father. Of course, the higher the probability of exclusion, the greater is the likelihood of paternity for a non-excluded man. [For example, if 90 percent probability of exclusion tests are administered to 100 non-fathers and the biological father, 90 non-fathers should be excluded and the biological father will be one of the 11 non-excluded test subjects. If 95 percent probability of exclusion tests are administered to 100 non-fathers and the biological father, 95 non-fathers should be excluded and the true father will be one of the six non-excluded subjects.] But *there is no direct relationship between the probability of exclusion and the likelihood of paternity. Likelihood of paternity cannot be extrapolated from the probability of exclusion.*" 16 Trial at 47. (Emphasis added.)

Understanding of the last two quoted sentences may be aided by restatement of one example, expression of a second example, and additional comments. It does not follow from an alleged father's failure to be excluded by 90 percent probability of exclusion tests that there is a 90 percent chance he is the biological father. If man A is not excluded by 90 percent probability of exclusion tests and man B is not excluded by 95 percent probability of exclusion tests, it does not follow that man B is twice as likely to be the biological father. There is no direct or inferable comparative relationship of the likelihood of paternity for two or more non-excluded men, each of whom is the subject of different probability of exclusion tests. Likelihood of paternity cannot be extrapolated, inferred, projected or predicted from probability of exclusion. See Ellman and Kaye, *Probabilities and Proof: Can*

*HLA and Blood Group Testing Prove Paternity?,* 54 N.Y.U. L. Rev. 1131, 1140-1141 (1979).

"Seldom is there only one possible combination of factors which a man must possess to have produced the child in question. Furthermore, more than one man could have one of the correct combinations. It is therefore impossible to prove conclusively that a given man is the father of the child. It is possible, however, to *calculate* the likelihood of paternity, which is the percent probability that a non-excluded alleged father is the true father of the child. The likelihood of paternity takes into account the test results of the mother, child, and alleged father, and compares the alleged father with a random man of the same race." 16 Trial at 46-47. (Emphasis added.)

The generally accepted recommendation and practice of the scientific community is to calculate likelihood of paternity for a non-excluded alleged father only if the serologic tests used for exclusion of paternity have a cumulative mean probability of exclusion of 90 percent or more. Abbott and Sell, *Joint AMA-ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage,* 10 Fam. L. Q., 247, 256-258 (1976); 16 Trial at 48; 54 N.Y.U. L. Rev. at 1161.

When the evaluated genetic markers and patterns for a non-excluded alleged father are obtained from blood tests having a 90 percent or higher cumulative exclusion probability, the likelihood of paternity for that individual is calculated by use of Bayes' Theorem as applied by Essen-Möller. Terasaki, *Resolution by HLA Testing of 1000 Paternity Cases Not Excluded by ABO Testing,* 16 J. Fam. L. 543, 544 (1977-78); 10 Fam. L. Q. at 261; 54 N.Y.U. L. Rev. at 1146-1149.

It is through compliance with these steps that otherwise legally satisfactory opinion testimony of likelihood of paternity is rendered admissible evidence to prove paternity.

Deserving mention are two recent Kansas decisions involving blood tests. In *Tice v. Richardson,* 7 Kan. App. 2d 509, 644 P.2d 490 (1982), a paternity action, it was held an opinion of likelihood of paternity arrived at by calculation based upon the results of human leucocyte antigen (HLA) tests was admissible to prove paternity. In contradistinction to the case before us, the *Tice* HLA tests were utilized to establish likelihood of paternity, not merely to establish probability of exclusion. The particular holding in *Tice,* based upon the foundation evidence there presented as well as the judicial notice taken, was that the results of HLA paternity inclusion blood testing and calculation is sufficiently established

and accepted scientific evidence to be valid evidence to prove paternity. Of course, the admission of such a conclusion into evidence in a paternity action is subject to satisfaction of the usual relevant legal standards. 7 Kan. App. 2d at 513.

In *State v. Washington,* 229 Kan. 47, 622 P.2d 986 (1981), a criminal action, comparative analysis of the defendant's blood, the victim's blood, and blood found at the victim's apartment, was conducted to establish the defendant's presence at the crime scene. The test findings and resultant opinion involved consideration of blood markers but paternity was not the subject. The analyses made were for the ABO blood groups or types, six enzyme markers and a protein marker. It was held the reliability of the analysis method used, Multi-System analysis, was shown by the evidence to be sufficient to permit the produced findings to be admitted into evidence; the analyst was qualified to perform the tests and make the findings; and the analyst was qualified to give an opinion of the probability that the blood found in the apartment was the defendant's. The Supreme Court restated and applied the standard for admissibility of scientific evidence enunciated in *Frye v. United States,* 54 App. D.C. 46, 293 F. 1013 (1923). In short, that standard is that an expert scientific opinion is admissible evidence if it is based upon scientific technique the validity of which is generally accepted within the relevant scientific community.

The growing popularity and acceptance of likelihood of paternity opinion evidence founded upon HLA test results is understandable. See *Tice,* 7 Kan. App. 2d at 513. The three basic blood group systems tests (ABO, RH and MNSs) as well as the Kell, Duffy and Kidd blood group systems tests are generally available and reliable. The cumulative probability of exclusion for these six tests is reported to be 63 percent to 72 percent. The HLA test alone has a probability of exclusion of 78 percent to 80 percent and when it is used in addition to the six other tests, the probability of exclusion apparently rises to at least 91 percent to 95 percent. 10 Fam. L. Q. at 256-258; 16 Trial at 48. At this last level of probability of exclusion, acceptable calculation of likelihood of paternity is possible. There are other scientifically accurate and accepted serologic tests, but it seems their availability varies and the limited increase in probability of exclusion achieved through their use may be disproportionate to their cost. 10 Fam. L. Q. at 254-255, 278-279; 54 N.Y.U. L. Rev. at 1161.

While all relevant evidence is admissible (K.S.A. 60-407[f]), to be relevant the evidence must have some tendency in reason to prove a material fact. See K.S.A. 60-401(b). In *State v. Baker*, 219 Kan. 854, 858, 549 P.2d 911 (1976), it is said evidence is relevant if it renders the desired inference more probable than it would be without the evidence, or if it has any tendency in reason to prove any material fact. Probative evidence is evidence that tends to prove an issue; it furnishes, establishes or contributes toward proof. *Akin v. Estate of Hill*, 201 Kan. 306, 311, 440 P.2d 585 (1968). As a rule of necessity, the trial court may exclude any evidence which may unfairly prejudice a jury. *State v. Davis*, 213 Kan. 54, 57, 515 P.2d 802 (1973); *Van Hoozer v. Farmers Insurance Exchange*, 219 Kan. 595, 613, 549 P.2d 1354 (1976). Even though evidence is relevant, it should be excluded if its prejudicial effect outweighs its probative value. *Van Hoozer*, 219 Kan. at 613.

Beck squarely testified his tests had an approximate 70 percent probability of exclusion and he was unable to exclude the defendant as the biological father of the child. He declined the opportunity to and did not testify as to. the likelihood of the defendant's paternity of the child. As noted, likelihood of paternity cannot be extrapolated from probability of exclusion. In the literature we have studied, we find nothing to the contrary. Simply put, evidence of the failure of a man to be excluded as the result of paternity exclusion tests is not proof of paternity. It has no tendency in reason to prove paternity. It does not render an inference of paternity more probable than it would be without that evidence. It is neither probative nor relevant. It is inadmissible in a paternity action. Admission of Beck's testimony was erroneous.

We believe lay jurors tend to give considerable weight to "scientific" evidence presented by "experts." It carries the mantle of impartial physical, or objective, fact. Uniquely applicable to the case before us is the following language of the Michigan Supreme Court in *People v. Nichols*, 341 Mich. 311, 331-332, 67 N.W.2d 230 (1954):

"All the scientific evidence in this case and in the cited cases is in accord that the results of blood tests may rule out but can never establish paternity. In *Stroh v. Hinchman* [37 Mich. 490], this Court said (p 497):

" 'All evidence should have some legitimate tendency to establish or disprove the fact in controversy, and whatever has no such tendency should be rejected.'

"The evidence here complained of had not the slightest probative value or tendency to prove defendant's paternity. Accordingly, it should have been rejected.

"That the error was . . . prejudicial, there can be no doubt here. . . . The use of scientific apparatus and tests and expert testimony as to scientific results, placed before the jury with an instruction that they could accord such weight thereto, bearing on the controverted issue, as they might deem proper, could not have failed to mislead the jurors into believing that this totally irrelevant evidence might be considered as having probative value. The average juryman is bound to be impressed by an array of scientific material and data presented through the testimony of expert witnesses under circumstances in which its utter irrelevancy is not made clear, but, on the contrary, it is permitted to pose as relevant testimony to be weighed by the jury. This was prejudicial to defendant."

Also on the subject of prejudicial error in the admission of paternity exclusion and other "scientific" test results, see *United States v. Addison,* 498 F.2d 741, 744 (D.C. Cir. 1974); *Winston v. Robinson & State,* 270 Ark. 996, 1002, 606 S.W.2d 757 (1980); *People v. Kelly,* 17 Cal. 3d 24, 31-32, 130 Cal. Rptr. 144, 549 P.2d 1240 (1976); *People v. Alston,* 79 Misc. 2d 1077, 1087-1088, 362 N.Y.S.2d 356 (1974); *State, ex rel., v. Morris,* 156 Ohio St. 333, 337, 102 N.E.2d 450 (1951).

We conclude the erroneous admission of Beck's testimony was substantially and unfairly prejudicial to the defendant.

For introduction into the medical, statistical and legal aspects of paternity testing, the interested reader may wish to examine: Mendelson, *From Here to Paternity,* 9 Barrister 12 (1982); Seider, *Who is the Father?,* 3 Family Advocate 13 (Fall 1980); Sussman, *Human Blood Groupings,* 2 Trauma 50 (1961); Forrest, *The Legal Implications of HLA Testing For Paternity,* 16 J. Fam. L. 537 (1977-1978); Sterlek and Jacobson, *Paternity Testing With The Human Leukocyte Antigen System: A Medicolegal Breakthrough,* 20 Santa Clara L. Rev. 511 (1980); Annot., 46 A.L.R.2d 1000 and Later Case Service; 3 Frankel, Lawyers Medical Cyclopedia §§ 24.24-24.29 (rev. 1970), and §§ 24.24-24.26b (1980 Supp.); 5 Attorneys' Textbook of Medicine, § 304.12 (3d ed. 1974 Supp.); *Cramer v. Morrison,* 88 Cal. App. 3d 873, 153 Cal. Rptr. 865 (1979); in addition to the other sources and authorities cited in this opinion.

Some argument was made in the trial court that under K.S.A. 23-131 the admission of Beck's testimony was mandated. We

cannot perceive K.S.A. 23-131 or any other statute requires the admission of irrelevant, nonprobative and prejudicial evidence for consideration by a jury. Plaintiffs have neither filed a brief nor otherwise appeared in this appeal; we are furnished no support for the argument made.

Subsequent to trial, the defendant filed a motion for judgment notwithstanding the verdict. One ground was that the evidence did not support the verdict. It was overruled. Defendant claims this was error. We agree.

Little worthwhile purpose would be served by recapitulation of the evidence in detail. Accordingly, we will address it in capsulized form.

The child was born July 8, 1978. Nine months prior to that was October 8, 1977. Depending upon which findings and testimony of the mother's attending physician are accepted, the limits of the period of time within which conception occurred were October 1, 1977, and November 21, 1977.

The defendant admitted to a single act of sexual intercourse. The question was when this occurred. According to defendant, it was on August 20 or 27, 1977, both Saturdays. The mother alleged it was on another Saturday, that is, October 8, 1977, but her trial testimony was fraught with uncertainty and contradiction. Her story was not direct and positive. See *State, ex rel., v. Wright*, 140 Kan. 679, 684, 38 P.2d 135 (1934). She conceded it was the Saturday night she and defendant attended the showing of a particular film at a particular theater in Kansas City. The theater manager testified the film was last shown on August 30, 1977. By an Iowa traffic citation issued to defendant, an Ames, Iowa, motel receipt, and the testimony of a third party, there was independent evidence the defendant was in Iowa, not in the metropolitan Kansas City area, the night of October 8, 1977.

The defendant and the mother had a second and less intimate "date." There was documentary evidence supporting the defendant's testimony this was on September 10, 1977, not a week or so after October 8, 1977.

We conclude the evidence was insufficient to support the verdict and judgment. It is true it has been said paternity may be adjudged solely upon the mother's testimony of an act of sexual intercourse with the putative father at or near the time the child was conceived and that he is the father (*State, ex rel., v. Wright,*

140 Kan. at 684), but the precedential case authority for that statement does not support a paternity judgment on evidence as uncertain and flimsy as the evidence in this case. *State, ex rel., v. Wright,* 140 Kan. at 684 (testimony of mother "direct and positive"); *State, ex rel., v. Lyons,* 107 Kan. 312, 313, 191 Pac. 281 (1920) (mother's description of the parties' relations "covered so much time and was so full of details . . . it is hard to believe they were manufactured, and . . . we find nothing in the record to render them incredible.")

It is unnecessary to address the other issues raised on appeal.

The judgment of the district court is reversed. The case is remanded with the instruction that judgment be entered in favor of the defendant.