No. 52,771

STATE OF KANSAS, *ex rel.* SHEILA HAUSNER, and SIMON HAUSNER, by and through his mother and next friend, SHEILA HAUSNER, *Appellees,* v. PAUL BLACKMAN, *Appellant.*

(662 P.2d 1183)

Opinion filed April 29, 1983.

*Louis S. Wexler,* of Wexler, Wingfield and Zemites, of Shawnee Mission, argued the cause and was on the briefs for appellant.

*David R. Gilman,* of Overland Park, argued the cause for appellees.

The opinion of the court was delivered by

MILLER, J.: This is a paternity case, filed pursuant to K.S.A. 38-1101 *et seq.,* by the State of Kansas *ex rel.* Sheila Hausner against defendant Paul Blackman for a determination of paternity and for child support. A jury trial resulted in a verdict and judgment that defendant is the father of the minor child, Simon Hausner; support was ordered. Defendant appealed; the Court of Appeals, in a unanimous opinion, reversed. *State ex rel. Hausner v. Blackman,* 7 Kan. App. 2d 693, 648 P.2d 249 (1982). We granted review.

The issues are: Is blood test evidence admissible to prove paternity and, if so, did the trial court commit prejudicial error in admitting the particular blood test evidence in this case? Is

K.S.A. 23-131 constitutional? And is the verdict and judgment in this case supported by substantial competent evidence? The Court of Appeals held that expert testimony, resulting from certain sophisticated and recently-developed blood test examinations, is admissible to show the probability of paternity, but that the trial court erred in admitting the specific blood test evidence offered in this case; that K.S.A. 23-131 is constitutional; and that the evidence was insufficient to support the verdict. We agree.

Expert opinion, based upon the results of blood tests, has been received in paternity cases for perhaps the last fifty or sixty years, but until recent years that evidence has been admissible only for the purpose of showing that the putative father could *not* be the father of the child; as a general rule, it was admissible only to show nonpaternity. The following summary of the development of blood tests and the value of blood test evidence is given in the following quotation from Chief Justice Burger's unanimous opinion in the case of *Little v. Streater*, 452 U.S. 1, 68 L.Ed.2d 627, 101 S.Ct. 2202 (1981):

"The discovery of human blood groups by Dr. Karl Landsteiner in Vienna at the beginning of this century, and subsequent understanding of their hereditary aspects, made possible the eventual use of blood tests to scientifically evaluate allegations of paternity. P. Speiser & F. Smekal, Karl Landsteiner 89-93 (1975). Like their European counterparts, American courts gradually recognized the evidentiary value of blood grouping tests in paternity cases, and the modern status of such tests has been described by one commentator as follows:

" 'As far as the accuracy, reliability, dependability—even infallibility—of the test are concerned, there is no longer any controversy. The result of the test is universally accepted by distinguished scientific and medical authority. There is, in fact, no living authority of repute, medical or legal, who may be cited adversely. . . . [T]here is now . . . practically universal and unanimous judicial willingness to give decisive and controlling evidentiary weight to a blood test exclusion of paternity.' S. Schatkin, Disputed Paternity Proceedings § 9.13 (1975).

"The application of blood tests to the issue of paternity results from certain properties of the human blood groups and types: (a) the blood group and type of any individual can be determined at birth or shortly thereafter; (b) the blood group and type of every individual remain constant throughout life; and (c) the blood groups and types are inherited in accordance with Mendel's laws. *Id.,* § 5.03. If the blood groups and types of the mother and child are known, the possible and impossible blood groups and types of the true father can be determined under the rules of inheritance. For example, a group AB child cannot have a group O parent, but can have a group A, B, or AB parent. Similarly, a child cannot be type M unless one or both parents are type M, and the factor rh' cannot

appear in the blood of a child unless present in the blood of one or both parents. *Id.*, §§ 5.03 and 6.02. Since millions of men belong to the possible groups and types, *a blood grouping test cannot conclusively establish paternity.* However, it can demonstrate nonpaternity, such as where the alleged father belongs to group O and the child is group AB. It is a negative rather than an affirmative test with the potential to scientifically exclude the paternity of a falsely accused putative father.

"The ability of blood grouping tests to exonerate innocent putative fathers was confirmed by a 1976 report developed jointly by the American Bar Association and the American Medical Association. Miale, Jennings, Rettberg, Sell, & Krause, Joint AMA-ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage, 10 Family L.Q. 247 (Fall 1976). The joint report recommended the use of seven blood test 'systems'—ABO, Rh, MNSs, Kell, Duffy, Kidd, and HLA—when investigating questions of paternity. *Id.*, at 257-258. These systems were found to be 'reasonable' in cost and to provide a 91% cumulative probability of negating paternity for erroneously accused Negro men and 93% for white men. *Id.*, at 254, 257-258.

"The effectiveness of the seven systems attests the probative value of blood test evidence in paternity cases. The importance of that scientific evidence is heightened because '[t]here are seldom accurate or reliable eyewitnesses since the sexual activities usually take place in intimate and private surroundings, and the self-serving testimony of a party is of questionable reliability.' Larson, Blood Test Exclusion Procedures in Paternity Litigation: The Uniform Acts and Beyond, 13 J. Fam. L. 713 (1973-1974). As Justice Brennan wrote while a member of the Appellate Division of the New Jersey Superior Court:

" '[I]n the field of contested paternity . . . the truth is so often obscured because social pressures create a conspiracy of silence or, worse, induce deliberate falsity.

" 'The value of blood tests as a wholesome aid in the quest for truth in the administration of justice in these matters cannot be gainsaid in this day. Their reliability as an indicator of the truth has been fully established. The substantial weight of medical and legal authority attests their accuracy, not to prove paternity, and not always to disprove it, but "they can disprove it conclusively in a great many cases provided they are administered by specially qualified experts" . . . .' *Cortese v. Cortese*, 10 N.J. Super. 152, 156, 76 A.2d 717, 719 (1950)." 452 U.S. at 6-8. (Emphasis supplied.)

*Little v. Streater* dealt with the claim of an indigent defendant, named as the father of an illegitimate child in a paternity action filed in Connecticut, of the denial of his due process and equal protection rights under the Fourteenth Amendment by application of a Connecticut statute which denied him access to blood tests for which he could not pay. The Supreme Court held that the cost requirement of the state statute did in fact effect a denial of the appellant's constitutional rights. While the issue here differs from that in *Streater*, the opinion of the court demonstrates the importance of blood test evidence to establish *non-*

*paternity,* and the quoted portion of the opinion is illuminating.

In 10 Am. Jur. 2d, Bastards §§ 32 and 118, we find the following discourse on blood test evidence:

"Serological blood tests to determine type or group are of especial value in cases of disputed paternity because, although they cannot indicate with precision that a particular person is the father of the child whose paternity is in issue, in many instances they can establish that an alleged father could not have been the sire. The accuracy of such tests, when performed and interpreted by properly qualified persons, is generally recognized and the results are generally held admissible for the purpose of establishing nonpaternity." § 32, p. 867.

"Blood grouping tests are particularly significant in bastardy proceedings, because when properly administered and interpreted, the results may categorically exclude the paternity of the putative father, and in some jurisdictions the courts may require the mother, child, and putative father in filiation proceedings to submit to blood grouping tests . . . .

"The general rules that evidence of blood grouping test results excluding paternity is admissible, and that evidence of results failing to establish nonpaternity is inadmissible, apply to bastardy proceedings." § 118, pp. 928-29.

The rule with respect to the receipt in evidence of blood test results in bastardy proceedings is stated in 10 C.J.S., Bastards § 82 (Supp. 1982), as follows:

"[I]t has been held that even in the absence of statutory authority, the results of blood tests are admissible in evidence . . . . In any event, *the results of a blood test are admissible in evidence only where definite exclusion or nonpaternity is established.*" (Emphasis supplied.)

In 1 Wigmore on Evidence § 165*a* (3rd ed. 1940), we find the following comment:

"[T]he blood-composition of a child may be some evidence as to the child's paternity. But thus far this trait (in the present state of scientific discovery as generally accepted) can be used *only negatively, i.e.* to evidence that a particular man P is *not* the father of a particular child C." (Emphasis in original.) pp. 610-11.

In Annotation on Blood Grouping Tests, found in 46 A.L.R.2d 1000 *et seq.*, we find the general rule stated in § 16: "Evidence of the results of blood grouping tests which fail to establish nonpaternity is generally held inadmissible in disputed paternity proceedings." p. 1036.

Most of the authority quoted above is based upon cases decided prior to 1970, and upon the state of accepted medical and scientific knowledge and practice at the time the cases were decided. The general rule was clear: Blood test results, when performed by and presented during the testimony of a qualified expert in the field, were admissible to prove nonpaternity, and

inadmissible to establish paternity because scientific expertise at that time was unable to provide an acceptable and accurate estimate or probability of paternity.

In recent years, however, a method of blood testing with a much higher exclusion rate, the human leukocyte antigen (HLA) test, has increasingly been utilized in paternity actions. The HLA test involves a method of tissue typing which detects antigens in white blood cells. Antigens are produced under genetic control by genes. The HLA test alone has an exclusion rate of 78 to 80 percent, and when used in addition to the six other basic blood group systems tests, ABO, Rh, MNSs, Kell, Duffy and Kidd, produces an exclusion rate of 91 to 95 percent. See Forrest, *The Legal Implications of HLA Testing for Paternity,* 16 J. Fam. L. 537 (1977-1978); Terasaki, *Resolution of HLA Testing of 1000 Paternity Cases Not Excluded by ABO Testing,* 16 J. Fam. L. 543 (1977-1978); and for recent cases where HLA tests were admitted in paternity actions see *Cramer v. Morrison,* 88 Cal. App. 3d 873, 153 Cal. Rptr. 865 (1979); *J. H. v. M. H.,* 177 N.J. Super. 436, 426 A.2d 1073 (1980); *Mtr Edward K. v. Marcy R.,* 106 Misc. 2d 506, 434 N.Y.S.2d 108 (1980); and *Tice v. Richardson,* 7 Kan. App. 2d 509, 644 P.2d 490 (1982).

Judge Rees's well-reasoned and well-documented discussion in the Court of Appeals opinion in this case bears repeating:

"The generally accepted recommendation and practice of the scientific community is to calculate likelihood of paternity for a non-excluded alleged father only if the serologic tests used for exclusion of paternity have a cumulative mean probability of exclusion of 90 percent or more. Abbott and Sell, *Joint AMA-ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage,* 10 Fam. L.Q. 247, 256-258 (1976); 16 Trial at 48; 54 N.Y.U. L. Rev. at 1161.

"When the evaluated genetic markers and patterns for a non-excluded alleged father are obtained from blood tests having a 90 percent or higher cumulative exclusion probability, the likelihood of paternity for that individual is calculated by use of Bayes' Theorem as applied by Essen-Möller. Terasaki, *Resolution by HLA Testing of 1000 Paternity Cases Not Excluded by ABO Testing,* 16 J. Fam. L. 543, 544 (1977-78); 10 Fam. L. Q. at 261; 54 N.Y.U. L. Rev. at 1146-1149.

"It is through compliance with these steps that otherwise legally satisfactory opinion testimony of likelihood of paternity is rendered admissible evidence to prove paternity.

"Deserving mention are two recent Kansas decisions involving blood tests. In *Tice v. Richardson,* 7 Kan. App. 2d 509, 644 P.2d 490 (1982), a paternity action, it was held an opinion of likelihood of paternity arrived at by calculation based upon the results of human leukocyte antigen (HLA) tests was admissible to prove

paternity. In contradistinction to the case before us, the *Tice* HLA tests were utilized to establish likelihood of paternity, not merely to establish probability of exclusion. The particular holding in *Tice,* based upon the foundation evidence there presented as well as the judicial notice taken, was that the results of HLA paternity inclusion blood testing and calculation is sufficiently established and accepted scientific evidence to be valid evidence to prove paternity. Of course, the admission of such a conclusion into evidence in a paternity action is subject to satisfaction of the usual relevant legal standards. 7 Kan. App. 2d at 513.

"In *State v. Washington,* 229 Kan. 47, 622 P.2d 986 (1981), a criminal action, comparative analysis of the defendant's blood, the victim's blood, and blood found at the victim's apartment, was conducted to establish the defendant's presence at the crime scene. The test findings and resultant opinion involved consideration of blood markers but paternity was not the subject. The analyses made were for the ABO blood groups or types, six enzyme markers and a protein marker. It was held the reliability of the analysis method used, Multi-System analysis, was shown by the evidence to be sufficient to permit the produced findings to be admitted into evidence; the analyst was qualified to perform the tests and make the findings; and the analyst was qualified to give an opinion of the probability that the blood found in the apartment was the defendant's. The Supreme Court restated and applied the standard for admissibility of scientific evidence enunciated in *Frye v. United States,* 54 App. D.C. 46, 293 F. 1013 (1923). In short, that standard is that an expert scientific opinion is admissible evidence if it is based upon scientific technique the validity of which is generally accepted within the relevant scientific community.

"The growing popularity and acceptance of likelihood of paternity opinion evidence founded upon HLA test results is understandable. See *Tice,* 7 Kan. App. 2d at 513. The three basic blood group systems tests (ABO, RH and MNSs) as well as the Kell, Duffy and Kidd blood group systems tests are generally available and reliable. The cumulative probability of exclusion for these six tests is reported to be 63 percent to 72 percent. The HLA test alone has a probability of exclusion of 78 percent to 80 percent and when it is used in addition to the six other tests, the probability of exclusion apparently rises to at least 91 percent to 95 percent. 10 Fam. L. Q. at 256-258; 16 Trial at 48. At this last level of probability of exclusion, acceptable calculation of likelihood of paternity is possible." 7 Kan. App. 2d at 696-97.

The serologist who testified at the trial of this case had not performed the HLA or any comparable test; he had only performed a series of blood grouping tests. He testified that he would expect *an exclusion rate of about seventy percent on the basis of those tests.* He expressed no opinion as to probability of paternity, and acknowledged that all that his tests accomplished was to establish that the defendant *could not be excluded* as the father of the child. The trial court denied a motion in limine which sought the suppression of this evidence and stated:

"The Court's reasoning is this: That while the evidence may not conclusively show paternity it is some indication of paternity by limiting the number of people

who might be. Further, *the fact that the defendant refused to take further testing which was offered to him and which would further eliminate the group of people who might be the father of this child.*
"[T]he Court intends to fully advise the jury as to the weight of testimony that is to be given [by] experts . . . ." (Emphasis added.)

There is no evidence at trial that further testing was offered to the defendant and that he refused to take such tests. The evidence admitted did not tend to establish that this defendant was the father of the child. As Judge Rees concluded:

"[E]vidence of the failure of a man to be excluded as the result of paternity exclusion tests is not proof of paternity. It has no tendency in reason to prove paternity. It does not render an inference of paternity more probable than it would be without that evidence. It is neither probative nor relevant. It is inadmissible in a paternity action. . . .

"We believe lay jurors tend to give considerable weight to 'scientific' evidence presented by 'experts.' It carries the mantle of impartial physical, or objective, fact. Uniquely applicable to the case before us is the following language of the Michigan Supreme Court in *People v. Nichols*, 341 Mich. 311, 331-332, 67 N.W.2d 230 (1954):

" 'All the scientific evidence in this case and in the cited cases is in accord that the results of blood tests may rule out but can never establish paternity. In *Stroh v. Hinchman* [37 Mich. 490], this Court said (p 497):

" ' "All evidence should have some legitimate tendency to establish or disprove the fact in controversy, and whatever has no such tendency should be rejected."

" 'The evidence here complained of had not the slightest probative value or tendency to prove defendant's paternity. Accordingly, it should have been rejected.

" 'That the error was . . . prejudicial, there can be no doubt here. . . . The use of scientific apparatus and tests and expert testimony as to scientific results, placed before the jury with an instruction that they could accord such weight thereto, bearing on the controverted issue, as they might deem proper, could not have failed to mislead the jurors into believing that this totally irrelevant evidence might be considered as having probative value. The average juryman is bound to be impressed by an array of scientific material and data presented through the testimony of expert witnesses under circumstances in which its utter irrelevancy is not made clear, but, on the contrary, it is permitted to pose as relevant testimony to be weighed by the jury. This was prejudicial to defendant.'

. . . .
"[T]he erroneous admission of Beck's testimony was substantially and unfairly prejudicial to the defendant." 7 Kan. App. 2d at 698-99.

We agree.

In *Hurd v. State*, 125 Ga. App. 353, 187 S.E.2d 545 (1972), the court held that blood grouping test results which did not es-

tablish nonpaternity, but indicated only that the defendant was among forty-three percent of the male population that could have fathered the child, were inadmissible. The court noted:

"[T]he test results were valueless but were permitted to pose as relevant testimony to be weighed by the jury, and could not have failed to mislead the jurors into believing that this totally irrelevant evidence might be considered as having probative value." 125 Ga. App. at 357.

This court has held evidence of blood grouping tests is relevant and admissible in criminal actions. Recent cases, however, indicate that more advanced testing has come into use, replacing the earlier Landsteiner tests. *State v. Washington*, 229 Kan. 47, 622 P.2d 986 (1981), discussed by the Court of Appeals, was a case involving rape, murder and burglary charges. An analysis of the defendant's blood, the victim's blood, and blood found at the victim's apartment was conducted. The blood was analyzed for the ABO blood types, six enzyme systems, and a protein system. It was determined that the person who had intercourse with the victim was a nonsecretor and both the defendant and the victim were nonsecretors. An expert testified that only six-tenths of one percent of the population would have the defendant's combination of blood factors. We held the evidence admissible. It will be noted that the defendant in *Washington* was identified as being one of only six-tenths of one percent of the population having the combination of factors placing him at the scene; in the case before us the expert testified that he would expect an exclusion of seventy percent; therefore, the defendant was within thirty percent, more or less, of the population having the requisite blood factors. This evidence does not zero in upon and pinpoint the defendant, as did the evidence in *Washington*.

A distinction has been drawn between the admissibility of blood grouping tests in criminal cases and the use of such test results in disputed paternity proceedings. Many criminal cases have rejected the rule prevalent in paternity cases and have refused to apply it in criminal cases, holding that evidence of blood grouping tests is relevant and admissible as a corroborating fact tending to show the accused's guilt. See Annot., Admissibility, Weight, and Sufficiency of Blood-Grouping Tests in Criminal Cases, 2 A.L.R. 4th 500; Annot., 46 A.L.R.2d 1000; and *People v. Lindsey*, 84 Cal. App. 3d 851, 863-64, 149 Cal. Rptr. 47 (1978). The evidence is corroborative only, and is not in itself sufficient to support the conviction of one accused of a crime.

We summarize our conclusions relative to the admission of blood test evidence in paternity cases, when given by a qualified expert in the field, as follows:

(1) Evidence of an alleged father's exclusion by blood tests is admissible in a paternity case.

(2) Blood test evidence which goes no further than to fail to exclude an alleged father is not proof of paternity and is inadmissible in a paternity case.

(3) Scientifically reliable evidence of an alleged father's likelihood of paternity, meeting relevant legal evidentiary standards, is admissible in such an action.

We agree with the Court of Appeals that the admission of Mr. Beck's testimony was error, and that it was substantially and unfairly prejudicial to the defendant and constituted reversible error.

K.S.A. 23-131 provides in pertinent part as follows:

"Whenever the paternity of a child is in issue in any action or judicial proceeding in which the mother and alleged father of such child are parties, the court . . . may order the mother, child and alleged father to submit to blood tests. . . . The tests shall be made by experts qualified as examiners of blood types who shall be appointed by the court. The experts shall be called by the court as witnesses to testify as to their findings and shall be subject to cross-examination by the parties."

We agree with the Court of Appeals that this statute is constitutional. It does not give a blanket endorsement to blood test evidence, nor does it make all such evidence admissible; in our view, the testimony must be considered by the court in the same light as other expert testimony. If the testimony is not reliable or if it does not constitute probative evidence as to the issues, the court need not admit the evidence. What we have heretofore said in this opinion indicates our view of the admissibility of such evidence and we think that the statute must be construed in conformity therewith.

Finally, we turn to the issue of whether the verdict and judgment is supported by substantial competent evidence. The Court of Appeals discussed this issue as follows:

"The child was born July 8, 1978. Nine months prior to that was October 8, 1977. Depending upon which findings and testimony of the mother's attending physician are accepted, the limits of the period of time within which conception occurred were October 1, 1977, and November 21, 1977.

"The defendant admitted to a single act of sexual intercourse. The question was when this occurred. According to defendant, it was on August 20 or 27, 1977, both Saturdays. The mother alleged it was on another Saturday, that is, October 8, 1977, but her trial testimony was fraught with uncertainty and contradiction. Her story was not direct and positive. See *State, ex rel., v. Wright,* 140 Kan. 679, 684, 38 P.2d 135 (1934). She conceded it was the Saturday night she and defendant attended the showing of a particular film at a particular theater in Kansas City. The theater manager testified the film was last shown on August 30, 1977. By an Iowa traffic citation issued to defendant, an Ames, Iowa, motel receipt, and the testimony of a third party, there was independent evidence the defendant was in Iowa, not in the metropolitan Kansas City area, the night of October 8, 1977.

"The defendant and the mother had a second and less intimate 'date.' There was documentary evidence supporting the defendant's testimony this was on September 10, 1977, not a week or so after October 8, 1977.

"We conclude the evidence was insufficient to support the verdict and judgment. It is true it has been said paternity may be adjudged solely upon the mother's testimony of an act of sexual intercourse with the putative father at or near the time the child was conceived and that he is the father (*State, ex rel., v. Wright,* 140 Kan. at 684), but the precedential case authority for that statement does not support a paternity judgment on evidence as uncertain and flimsy as the evidence in this case. *State, ex rel., v. Wright,* 140 Kan. at 684 (testimony of mother 'direct and positive'); *State, ex rel., v. Lyons,* 107 Kan. 312, 313, 191 Pac. 281 (1920) (mother's description of the parties' relations 'covered so much time and was so full of details . . . it is hard to believe they were manufactured, and . . . we find nothing in the record to render them incredible.')" 7 Kan. App. 2d at 700-01.

We agree with the Court of Appeals rationale and with its conclusion. The plaintiff's physician testified that he performed a sonogram on Sheila Hausner. The test, regularly used and recognized in the medical world, indicates the age of the fetus and is considered fairly reliable, with perhaps a ten-day variance either way. On June 16, 1978, the test then administered indicated a fetus of from thirty-one to thirty-one and one-half weeks' gestation. Adding ten days to thirty-one and one-half weeks, or a total of thirty-three weeks, indicates that the time of conception was November 8, 1977. Plaintiff was uncertain as to the date intercourse occurred, but she was positive that it occurred on the night the parties attended a movie entitled "Fire Sale." There was positive and uncontradicted testimony that the last showing of that film at the theater which the parties attended occurred on August 30, 1977. The child was born on July 8, 1978; the physician testified that he did not feel that the child was overdue, and that it could have been from one to two weeks premature. The plaintiff testified that the child was a full-term baby,

and that it was not premature. There was no testimony to indicate that the child was six or more weeks overdue, as would certainly have been the case if the child had been conceived in August 1977.

We conclude that the verdict and judgment in this case are not supported by substantial competent evidence.

The opinion of the Court of Appeals is affirmed and the judgment of the district court is reversed.