**Mary IMMS and Heather Elizabeth Imms, a minor, b/n/f Mary Imms, Respondents,**

v.

**James R. CLARKE, Appellant.**

**No. WD 33341.**

Missouri Court of Appeals, Western District.

June 14, 1983.

Robert G. Duncan, Gladstone, for appellant.

William E. Shull, Kearney, for respondents.

Victoria S. Schwartz, Missouri Dept. of Social Services, Michael R. Henry, Gen. Counsel Div., Jefferson City, amicus curiae.

Before SHANGLER, P.J., and PRITCHARD and DIXON, JJ.

SHANGLER, Presiding Judge.

The plaintiff Imms sought a declaratory judgment that the defendant Clarke was the natural father of the infant Heather Elizabeth Imms, and to adjudicate support for the child. The jury returned a verdict that the defendant Clarke was the natural father of the child Heather and awarded a sum for her support.

The evidence was that the mother, Mary Imms, was never married and Heather was her only child. On September 2, 1978, Mary Imms accepted an invitation to the Lake of the Ozarks for a Labor Day weekend with friends. There she was introduced to James Clarke, and the following evening she accompanied him on a boat ride around the lake. The defendant stopped the boat outside a cove and they engaged in an act of sexual intercourse. The plaintiff Imms returned to the lake for the next few weekends and, on each occasion, shared the Clarke cabin and continued the sexual practice. The defendant Clarke then suggested they cool their ardor and she did not return to the lake until November. Around Thanksgiving of 1978, the plaintiff Imms discovered she was pregnant. She telephoned Clarke who at first responded that "he would not shirk his responsibility," and that they should talk about it. Clarke was "very understanding" during that encounter: "He said he would do everything he possibly could to help me financially, emotionally." Clarke soon began to waver: "Jim started saying that he no longer wanted the responsibility. He said he couldn't handle it—he didn't want to accept it; I would just have to do it on my own." It was her testimony that for a period of at least eleven months before the birth of Heather, she was intimate with only the defendant Clarke. The child was born on June 13, 1979. It was the Imms testimony that Clarke never denied the paternity of the child.

The defendant Clarke acknowledged the intimacy with Mary Imms on September 3, 1978, and that thereafter they had sexual relations on at least five separate occasions. He repeatedly denied that he was the father of the child. He testified he never sent the child gifts, nor money, nor any other token for support, nor did he ever see the child other than on the occasion of the court proceeding.

The only other testimony was on behalf of the mother. It was Dr. McCalmon, an expert in immunology with extensive experience in the use of the Human Leukocyte Antigen [HLA] test to match donor and recipients for organ transplants. The witness had conducted more than ten thousand of such tissue matchings. HLA is a test also used to determine paternity. The witness subjected the blood samples taken from the mother, the child Heather, and putative father Clarke to the HLA test procedure. The expert explained that the HLA test maps the genetic material of the child—twenty-three pairs of chromosomes, twenty-three transmitted by each parent—through the antigens in the white blood corpuscles. The HLA system determines genes and their location on chromosomes. The system uses different locations labeled A, B, C, D and DR. The A, B and C loci were tested and each demonstrated that the defendant Clarke and the child Heather shared the paternal haplotype [inherited pairs of antigens]. [The expert discarded the CX combination found as not "that discriminating" under present test techniques. The D and DR loci, also, were not tested for other reasons.][1] The expert testified that any among some 170,000 combinations of [other than those identified in

1. "The antigens of the A, B and C series are detected by serological methods. The D series antigens, in contrast, are detected by complex culture techniques. Since antisera to detect the C antigens are not readily available, most laboratories confine their typing to the A and B series antigens." N. Bryant, Disputed Paternity: The Value and Application of Blood Tests, at 112 (1980). These test limitations, although implicit in the testimony of expert McCalmon, more fully inform the reasons. That the A and B loci are the two loci of the HLA region used to evaluate paternity in well-conducted tests is repeated in all the authorities. See Terasaki, Resolution by HLA Testing of 1000 Paternity Cases Not Excluded by ABO Testing, 16 J.Fam.L. 543, 545 (1978).

the child] antigens, if found in the father would have conclusively excluded paternity. The expert then applied the Bayes Theorem [a device of statistical interpolation we discuss more fully] to a random sampling of Caucasian population [the Clarke racial trait] to arrive at the 89.1136 percent probability that the defendant was the father of the child Heather.[2] The court allowed the jury to receive this evidence above objection, and the defendant appeals its competency.

The complaint the father makes on appeal is that the opinion by expert McCalmon that there was an 89.1136 percent possibility that Clarke was the biological father of the child Heather was not admissible because the HLA tissue typing test is not a generally accepted procedure in the scientific community, and that otherwise, the factual basis for the opinion was not established in evidence. We defer response to the contention that the HLA test does not yield a reliable conclusion of probability of paternity, and turn first to the subsumed contention—that the HLA test does not stand in the scientific community.

█ It is the rule that results of scientific tests and expert opinions derived from them are admissible only if the scientific principle involved is considered generally reliable and accurate by the scientific community concerned. *State v. Johnson,* 539 S.W.2d 493, 501[1–3] (Mo.App.1976); *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923). The reliability of blood tests to exclude parentage—that is, to prove *nonparentage* —in certain cases of blood groups is unquestioned in the scientific world and is admitted for that purpose in our courts. *State v. Summers,* 489 S.W.2d 225, 228[4] (Mo.App. 1972). These tests—six basic procedures, the ABO, Rh, Kell among them—involve

only a small number of variable factors, however, so that the cumulative possibility of exclusion of paternity amounts to only 63 to 72 percent—depending on the race. *Joint AMA–ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage,* 10 Fam.L.Q. 247, 257 (1976); *Accord Cramer v. Morrison,* 88 Cal. App.3d 873, 153 Cal.Rptr. 865, 867 (1979); *T.A.L.S. v. R.D.B.,* 539 S.W.2d 737, 739[7, 8] (Mo.App.1976). HLA tests, as we noted, involve a much more varied set of factors— the antigens [genetic fingerprints] in the white blood cells—so that the derived percentile of probability becomes more conclusive. Thus, the HLA white blood cell procedure used conjunctively with the red blood group systems [ABO, Rh, Kell and the others] raises the exclusion probability from 97 percent or higher. Reisner and Bolk, *A Layman's Guide to the Use of Blood Group Analysis in Paternity Testing,* 20 J.Fam.L. 657, 666, 671 (1981); *Carlyon v. Weeks,* 387 So.2d 465, 466 (Fla.Dist.Ct.App.1980); Beautyman, *Paternity Actions—A Matter of Opinion Or a Trial of the Blood?,* 4 J. Legal Med. 17, 19 (1976); Note, *Blood Test Evidence in Disputed Paternity Cases: Unjustified Adherence to the Exclusionary Rule,* 59 Wash.U.L.Q. 977, 986 (1981); *Commonwealth v. Blazo,* 10 Mass.App. 324, 406 N.E.2d 1323, 1325[1] (Mass.App.1980).

The adjudicated cases as well as the scientific literature compel conclusion that the HLA test is generally accepted as reliable as evidence of the likelihood of paternity. *See among others Cramer v. Morrison,* 88 Cal.App.3d 873, 153 Cal.Rptr. 865 (1979); *Carlyon v. Weeks,* 387 So.2d 465 (Fla.Dist. Ct.App.1980); *Tice v. Richardson,* 7 Kan. App.2d 509, 644 P.2d 490 (1982); *Commonwealth v. Blazo,* 10 Mass.App. 324, 406 N.E.2d 1323 (Mass.App.Ct.1980); *Malvasi v. Malvasi,* 167 N.J.Super. 513, 401 A.2d 279

2. The answer actually given by the expert was: "So the chance or the probability of not being the father is 11 percent, or, the probability of being the father is going to be an 89 percent." That the expert may have meant, not a probability of paternity, but a percentage of exclusion is made clear by further answer: Q: "And what was the percentage of exclusion in this case?" A: "Eighty-nine percent." Q: "All

right. And in fact, all of the tests confirmed that there was a possibility that he was the father, and none of them excluded him, is that right?" A: "That's correct." Our discussion shows that in terms of logic, tests or extrapolation, there is no direct relationship between the probability of exclusion and the likelihood of paternity.

(1979); *HLA Test Results Admissible to Prove Paternity Under Pre-1982 Idaho Law,* 9 Fam.L.Rep. 2441 (1983).

The opinion the expert witness McCalmon tendered: that there was an 89.1136 percent likelihood that Clarke was the biological father of the child Heather, rested on the HLA test result in combination with the ABO red cell test only. For some reason not explained, Dr. McCalmon did not resort to the other five standard tests of red blood group systems [Rh, MNSs, Kell, Duffy and Kidd], each an inexpensive and easily conducted procedure. These tests, combined with the HLA test, provide a probability of exclusion of 97 percent or more. Note, *Blood Test Evidence in Disputed Paternity Cases: Unjustified Adherence to the Exclusionary Rule,* 59 Wash.U.L.Q. 977, 986 (1981); *Joint AMA–ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage,* 10 Fam.L.Q. 247 (1976); Stroud, Bundrant and Galindo, *Paternity Testing: A Current Approach,* 16 Trial 46 (1980); *Carlyon v. Weeks,* 387 So.2d 465, 466 (Fla.Dist.Ct.App.1980); *State ex rel. Hausner v. Blackman,* 7 Kan.App.2d 693, 648 P.2d 249 (1982), *aff'd,* 233 Kan. 223, 662 P.2d 1183 (1983). As we noted, there is doubt whether the opinion of expert McCalmon meant that the tests evidenced an 89.-1136 percent *likelihood of paternity* or that the *probability of exclusion* was by that percentile.

■ The *probability of exclusion* and the *likelihood of paternity* describe two different statistical values. The definitive distinction—often cited—is given in 16 Trial 46, l.c. 47 (1980):

One of the most prevalent confusions in paternity testing is the difference between the meaning of the terms "probability of exclusion" and "likelihood of paternity." Probability of exclusion is the probability that the tests employed will exclude a falsely accused man. For example, if the probability of exclusion with the tests employed is 95 percent, of 100 non-fathers, 95 will be excluded and five will not be excluded. If the probability of exclusion with the tests employed is 95

percent and no exclusion is obtained, either the alleged father is the true father or he is one of the five out of 100 non-fathers that the tests would not exclude. Another way of stating this is that there is a five percent chance that the alleged father is not the true father, but the tests used would not exclude him.

*This does not mean that there is a 95% chance that the alleged father is the true father. Of course, the higher the probability of exclusion, the greater is the likelihood of paternity for a non-excluded man. But there is no direct relationship between the probability of exclusion and the likelihood of paternity. Likelihood of paternity cannot be extrapolated from the probability of exclusion.* [emphasis added]

Therefore, probability of exclusion—unless in the extreme range—is of little aid to a jury to determine the likelihood that the defendant is the biological father of the child. The significance of the probability of exclusion is that if the defendant is not excluded as a possible father, the likelihood of paternity can be estimated by consideration of other available empirical evidence. Reisner and Bolk, *A Layman's Guide to the Use of Blood Group Analysis in Paternity Testing,* 20 J.Fam.L. 657, 672 (1981); Ellman and Kaye, *Probabilities and Proof: Can HLA and Blood Group Testing Prove Paternity?,* 54 N.Y.U.L.Rev. 1131, 1147 (1979); *State ex rel. Hausner v. Blackman,* 7 Kan.App.2d 693, 648 P.2d 249 (1982), *aff'd,* 233 Kan. 223, 662 P.2d 1183 (1983).

■ It is the *likelihood of paternity* value and not the *probability of exclusion,* therefore, which is probative for a jury on the issue of fatherhood. A statistic that the probability of exclusion is 89.1136 percent—that is, that the defendant by that percentage of probability was not falsely accused—without other explanation or evidence grossly exaggerates the impact of the proof. For that statistic, stated inversely, connotes that a full 11 percent of the Caucasian male population, at random, could be the actual father of the child. Thus, the accepted recommendation and practice of

the scientific community calculates *likelihood of paternity* only if the serologic tests used for exclusion of paternity accumulate a mean *probability of exclusion* of 90 percent or more.[3] *Joint AMA–ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage,* 10 Fam.L.Q. 247, 256–8 (1976); 16 Trial at 48 (1980); 54 N.Y.U.L.Rev. 1131, 1161 (1979). This court recognized that such a probability was only the threshold of the admissibility of blood test evidence to establish paternity [although the HLA procedure apparently was not used]. *State ex rel. Williams v. Williams,* 609 S.W.2d 456, 457 (Mo.App. 1980). *See also Carlyon v. Weeks,* 387 So.2d 465 (Fla.Dist.Ct.App.1980); *State ex rel. Hausner v. Blackman,* 7 Kan.App.2d 693, 648 P.2d 249 (1982), aff'd, 233 Kan. 223, 662 P.2d 1183 (1983).

■ To convert the probability of exclusion statistic to a likelihood of paternity as a probative fact in a paternity proceeding, the probability of exclusion must be combined with another factum of information the scientists call the *prior probability of paternity.* Reisner and Bolk, *A Layman's Guide to the Use of Blood Group Analysis in Paternity Testing,* 20 J.Fam.L. 657, 670 (1981). It combines the quantitative medical test evidence—the gene characteristics found in the defendant, the mother and the child to come to a *probability of exclusion* of the male as the father. If the tests do not exclude the male as a putative father, then that probability is combined with the probability that a randomly selected male from the general population will exhibit those gene characteristics—the *prior probability of paternity.* Stroud, Bundrant, Galindo, *Paternity Testing: A Current Approach,* 16 Trial 46, 47 (1980); Beautyman, *Paternity Actions—A Matter of Opinion Or a Trial of the Blood?,* 4 J. Legal Med. 17 (1976); *State ex rel. Hausner v. Blackman,*

7 Kan.App.2d 693, 648 P.2d 249 (1982), *aff'd,* 233 Kan. 223, 662 P.2d 1183 (1983). The Bayes Theorem is the formula by which the conversion is made. It is a basic device of probability theory which describes the way new statistical information [probability of exclusion] alters a previously established probability [the frequency with which these antigens appear in the random population at large]. *See* 54 N.Y.U.L.Rev. 1131, 1147 (1979); *Tice v. Richardson,* 7 Kan.App.2d 509, 644 P.2d 490, 491[1] (1982). Thus the Bayes Theorem derives the *likelihood of paternity* [sometimes called the paternity index] from the probability of exclusion disclosed by the antigen test results of the putative father, mother and child combined with probability that a random man of the same race shares those genetic characteristics. The Bayes Theorem *likelihood of paternity* for the putative father, then, is "the ratio of his probability to the sum of the probabilities for both men." Terasaki, *Resolution by HLA Testing of 1000 Paternity Cases Not Excluded by ABO Testing,* 16 J.Fam.L. 543, 549 (1978). Stated otherwise: "The chance of paternity of a random man is used as a unit of measurement or reference to evaluate the chance of paternity of the putative father." N. Bryant, *Disputed Paternity,* at 155 (1980).

The witness McCalmon described the genetic information the HLA and ABO tests yielded and then made this application of the Bayes Theorem:

"In fact, the child and the alleged father, putative father, have the gene combinations that we call the paternal haplotype. Each one of us has a maternal haplotype. These are the genetic information received from our mother. And the paternal are those combinations and gene frequencies obtained from our father. That is there.

**3.** We do not say that serologic tests which adduce a mean probability of exclusion of less than 90 percent are without value as evidence. We say only that a statistic of such numerical prominence so exaggerates the probative worth of the evidence as *proof of paternity* and so obscures the inverse reality—that a full 10 percent or more of the male population, at random, could be the actual father—as to mislead the finder of fact. In a case where the serologic tests undertaken *to prove paternity* yield a low probability of exclusion so as to prevent that evidence from use to *prove paternity* —there is nothing to prevent the defendant accused as the father from the use of those results to prove *nonpaternity.*

Next we have, what is the chance the individual is not the father? [Drawing on new sheet.] We call it P, for probability, and NF, for not father. And according to Bayes' Theorem, given a known frequency of occurrence we ask, what is the chance of finding a second occurrence. Basically what we're asking here is knowing how often the A3/B7 [the identifiable antigens found in both the defendant and the child]—how often this occurs in the random Caucasian population."

The witness went on to describe the typings found both in his thousands of transplant experiences as well as those recorded in the international scientific community to conclude that the A3/B7 characteristic is found in 5.3 percent of the Caucasian population. The witness then concluded:

"And taking all of those into consideration, we basically double . . . the frequency of 5.3; and we came up with a probability of not more—of .1088—and let's round it off to .11. *So the chance or the probability of not being the father is 11 percent, or the probability of being the father is going to be an 89 percent.*" [emphasis added]

The question was then asked:

"And what was the *percentage of exclusion* in this case?" [emphasis added]

McCalmon answered:

"*Eighty-nine percent.*" [emphasis added]

■ The conclusion of the expert was admissible as a probative fact on the issue of paternity only if the statistic amounted to a *likelihood of paternity* [or the paternity index, as sometimes described]. The premises for such a conclusion of opinion were available—the tests, the probability of a person in the random population [not the defendant] who shared the genetic markers, and the operation of the Bayes Theorem to convert that probability upon probability to a *likelihood of paternity.* The responses of the expert, however, were given in terms of *probability of exclusion*—a statistic from which the likelihood of paternity—unless extremely high—simply cannot be extrapolated. Stroud, Bundrant and Galindo, *Paternity Testing: A Current Approach,* 16 Trial 46, 47 (1980); *State ex rel. Hausner v. Blackman,* 7 Kan.App.2d 693, 648 P.2d 249 (1982), *aff'd,* 233 Kan. 223, 662 P.2d 1183 (1983).

A probability of exclusion less than 90 percent is of *no* probative value and should not be before the jury. It was error to have received the evidence.

■ The cause is remanded to the trial court for further proceedings. The court may, within the discretion conferred by Rule 60.01, order the principals to complete the cycle of serological tests [the five other red blood tests, easily administered and of minimal cost, neglected by the expert in conjunction with the HLA procedure]. *State v. Summers,* 489 S.W.2d 225, 227[3] (Mo.App.1972). It may be, as often results, that the full combination of tests will yield a probability of exclusion so high as to be probative, without more, of paternity [99.-10–99.75 percent—"extremely proved"; 99.-80–99.90—"practically proved," *Scientific and Expert Evidence,* at 963 (E. Imwinkelreid 2d ed. 1981) ]; *Cramer v. Morrison,* 88 Cal.App. 873, 153 Cal.Rptr. 865, 867 (1979); *Carlyon v. Weeks,* 387 So.2d 465, 466 (Fla. Dist.Ct.App.1980); *Tice v. Richardson,* 7 Kan.App.2d 509, 644 P.2d 490, 494 (1982). Whether or not the trial court chooses to exercise discretion under Rule 60.01 to order the supplemental tests usual to such a determination, the defendant is granted a new trial. The expert may then offer an opinion on the *likelihood of paternity* formulated by the Bayes Theorem from the tests and the other empirical evidence. In any event, that likelihood, however conclusive numerically, shall be submitted to the trier of fact along with all the other trial nonmedical evidence—the admissions of the parties as to the intimacies, the times of the copulations, access by other males to the mother during the period of conception, etc. —to come to a determination of paternity. *Turek v. Hardy,* —— Pa.Super. ——, 458 A.2d 562 (Pa.Super.1983).

The appeal raises another issue, one of evidence. The parties are apprised of the

contention and will avoid its vexation on a new trial.

The cause is reversed and remanded for new trial.

All concur.