[Civ. No. 64440. Second Dist., Div. Three. Jan. 31, 1983.]

COUNTY OF VENTURA, pro se and Minor, Plaintiff and Appellant, v. PETER MARCUS, Defendant and Respondent.

**COUNSEL**

Michael D. Bradbury, District Attorney, and C. Stanley Trom, Deputy District Attorney, for Plaintiff and Appellant.

Mary M. Howard-Brodie for Defendant and Respondent.

**OPINION**

**POTTER, Acting P. J.**—Plaintiff County of Ventura on behalf of Jarrod P., a minor, appeals from the judgment of nonpaternity in favor of defendant Peter Marcus after defendant's motion for judgment, pursuant to Code of Civil Procedure section 631.8, was granted at the close of plaintiff's case.

The record on appeal consists of a clerk's transcript, and engrossed statement on appeal which the trial court certifies as setting forth fairly and truly the evidence of proceedings in the matter.

The complaint alleged that Ruth T. is the natural mother of the minor, born October 10, 1977, and that defendant is the father. It further alleges that defendant has failed to provide sufficient funds and that the County of Ventura has furnished public welfare assistance and continues to provide such financial support at the rate of $183 per month. Defendant's answer denies that he is the father of the minor and raises as an affirmative defense a prior adjudication that one Michael P. is the father.

Defendant's motion for summary judgment based on the prior judgment was denied October 24, 1980, and an at issue memorandum was filed. The case was

continued to April 20, 1981, at plaintiff's request, to obtain a ruling on a pending motion to vacate the paternity order relating to Michael P. At the trial it was established that "the judgment against Michael P. had been vacated" and the court took judicial notice of all the matters in its file including a human leukocyte antigen (HLA) tissue typing test report showing that Michael P. was excluded as the father of the minor.

The minor's mother was the only witness for plaintiff. She testified that she was the minor's mother and that she originally believed that Michael P. was the minor's father inasmuch as she had been having a relationship with Michael P. for some period of time prior to and about the time of conception. She had concluded that the date of conception was on or about January 12, from the fact that she missed her menstrual period at the end of January 1977. Her relationship with Michael P. had begun to deteriorate and in January she dated defendant every day. She testified further that she had sexual intercourse with defendant on one occasion in late January at defendant's home. She described the occurrence as having involved her and defendant beginning an act of sexual intercourse after their respective children were in bed, and their being interrupted by the children awakening. She described the intercourse as "incomplete because Mr. Marcus did not reach a climax nor had he ejaculated during the act of intercourse." This was the only act of intercourse between the minor's mother and defendant and she "strongly denied having sexual relations with anyone other than [Michael P.] and Marcus" during the period of possible conception.

Pursuant to stipulation, an HLA paternity blood test comparing blood samples of the mother, the minor and defendant was conducted at the UCLA laboratory. The report was received in evidence. It expressed "the opinion of the experts that [there] was an 85.95% probability that Peter Marcus was the father of" the minor.[1]

The mother was impeached by her testimony admitting execution of a welfare application declaring under penalty of perjury "that Michael P. had been the only person with whom she had had sexual intercourse during the probable period of conception." She explained that the reason she had made this statement was because "she did not consider that the one sexual occurrence with Peter Marcus, about which she had previously testified, to be a completed act of intercourse."

Plaintiff rested and defendant made his motion for dismissal.

In ruling on the motion, the court "stated that it believed [the minor's mother] was being truthful in her testimony concerning her intercourse with the

[1]Though made an exhibit, this report was returned to the party submitting same and has not been made a part of the record on this appeal.

defendant" but "that there was no question that plaintiff had not met its burden of proof."

## Contentions

Plaintiff contends that the court erred in granting the motion to dismiss because (1) plaintiff's evidence established a prima facie case, and (2) the finding of nonpaternity is not supported by substantial evidence.

Defendant controverts both of plaintiff's contentions.

## Discussion

### Summary

█ In ruling on defendant's motion, the court was required to weigh the evidence. This included weighing both the credibility of the mother's testimony and the persuasiveness of the expert opinion. The finding of nonpaternity necessarily includes noncredence of the mother's testimony that the only possible fathers were defendant and Michael P. and evaluation of the expert opinion as nonpersuasive. The mother's credibility was impeached by her contradictory sworn statement, and the expert opinion was properly evaluated in view of the equivocal nature of the opinion expressed. The court's findings adverse to plaintiff are, therefore, supported by substantial evidence.

### Weighing of Evidence Authorized

Code of Civil Procedure section 631.8 expressly authorizes and requires that upon a motion to dismiss being made thereunder, "[t]he court as trier of facts shall weigh the evidence . . . ." This language is uniformly construed in several appellate decisions. Typical is *Miller* v. *Dussault* (1972) 26 Cal.App.3d 311, 316 [103 Cal.Rptr. 147], where the court said: "Enacted in 1961, section 631.8 provides a substitute for the nonsuit motion formerly available in nonjury trials. It permits either party to move for judgment at the close of the other's case. It authorizes the court to weigh the evidence and make findings. In weighing the evidence, the court may exercise the prerogatives of a fact trier *by refusing to believe witnesses and by drawing conclusions at odds with expert opinion*; if it grants the motion, its findings are not reversible if supported by substantial evidence. (*Trigg* v. *Smith*, 246 Cal.App.2d 510, 515 [54 Cal.Rptr. 858]; *Greening* v. *General Air-Conditioning Corp.*, 233 Cal.App.2d 545, 550 [43 Cal.Rptr. 662].)" (Italics added.)

Plaintiff seeks to limit the above rule to cases where the plaintiff's evidence does not establish "a prima facie case" "because the plaintiff failed to prove an

essential element of his cause of action, or because there was substantial evidence to support the judgment," but the authorities plaintiff relies upon do not support this limitation. *Greening* v. *General Air-Conditioning Corp., supra,* 233 Cal.App.2d 545, upon which plaintiff relies, reversed a dismissal under Code of Civil Procedure section 631.8 upon the basis that the court erroneously failed to consider res ipsa loquitur which should have been weighed as a factor in the evidentiary basis for a finding of negligence in light of the uncontradicted physical evidence. The case contains no discussion of the court's power to weigh the evidence where the testimony of plaintiff's witnesses, if believed, establishes a prima facie case.

Plaintiff also relies on *Garber* v. *City of Los Angeles* (1964) 226 Cal.App.2d 349 [38 Cal.Rptr. 157], where again a dismissal under section 631.8 was reversed. Part of plaintiff's proof was uncontradicted testimony that the alleged defect in the city sidewalk had been in existence for five years prior to plaintiff's fall. The court did say that such evidence "must be accorded probative value for plaintiff." (*Id.,* at p. 354.) Thus, the court's failure to find on the issue of defendant's notice of the defect, despite a specific request for such finding, was held erroneous. The opinion neither states nor implies that the court could not have found against notice on such record, only that it was required to make a finding.

Another reversal under section 631.8 occurred in *Heap* v. *General Motors Corp.* (1977) 66 Cal.App.3d 824 [136 Cal.Rptr. 304]. The uncontradicted evidence of the physical properties of defendant's product on the basis of which plaintiff's expert opined it was defective was held to foreclose the court's contrary finding "based . . . on its own observations and experiences which is clearly improper when it is contrary to the evidence introduced. [Fn. omitted.]" (*Id.,* at p. 830.) Both *Garber* and *Heap* are simply applications of the rule stated in *Joseph* v. *Drew* (1950) 36 Cal.2d 575, 579 [225 P.2d 504], where our Supreme Court described the testimony of a witness and stated, "No effort was made to impeach this witness and his testimony stands uncontradicted in the record." Concerning this testimony, the court said (*ibid.*): "It is the general rule that 'the uncontradicted testimony of a witness to a particular fact may not be disregarded, but should be accepted as proof of the fact.' (10 Cal.Jur. § 362, p. 1143; *Estate of Warner,* 167 Cal. 686, 690 [140 P. 583]; *Hynes* v. *White,* 47 Cal.App. 549, 552] 190 P. 836].) While there are exceptions to this rule, the fact to which the witness testified here concerned the generally accepted meaning of a phrase when used in connection with the architectural profession. Under such circumstances, the rule is peculiarly applicable for if it was claimed that the witness did not speak the truth, contrary evidence concerning such generally accepted meaning would have been readily available through any of the numerous members of that profession, and yet none was called."

An essential element of the rule stated, of course, is the lack of either contradiction or impeachment. Where either factor is present, there is a rational basis for the rejection of the testimony and the trier of fact may do so in the process of weighing the evidence.

The mother's testimony was impeached. The court was not required to credit her testimony that defendant and Michael P. were the only two possible fathers. Though there was no contradictory evidence, there was ample impeaching evidence. She was impeached by her former sworn statement that Michael P. was the only possible father. The court's statement that he credited her testimony as to her intercourse with defendant does not include crediting her testimony as to the lack of intercourse with anyone else, which is impliedly rejected by the court's finding. The court's authority to weigh the mother's testimony clearly included the power to disbelieve her in this respect. Consequently, we cannot substitute our own evaluation of her testimony. There remains, however, the question whether the laboratory test report, which is neither impeached nor contradicted, deprives the court's finding of evidentiary support.

*Laboratory Report Equivocal*

As stated in *Greening* v. *General Air-Conditioning Corp., supra,* 233 Cal.App.2d at page 551, the result of the direction in Code of Civil Procedure section 631.8, that the court weigh the evidence is: "The following then becomes the appropriate rule on appeal: ' "When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court . . . ." ' (*Callahan* v. *Gray,* 44 Cal.2d 107, 111 [279 P.2d 963]; 3 Witkin, Cal. Procedure, Appeal, § 88, pp. 2251-2252.)"

What then are the inferences that can be drawn from the laboratory report which, as described in the engrossed statement on appeal, stated the opinion of the experts that there "was an 85.95% probability that Peter Marcus was the father of [the minor]." Since appellant has not included the report in the record, we must look to outside sources to ascertain the meaning of this opinion.

Fortunately, numerous published sources are available, including a learned treatise by the head of the very laboratory which produced the opinion. That treatise, which appears in the Journal of Family Law,[2] explains in detail what the meaning of a percentage "probability of paternity" is. (*Id.,* at p. 543.) It is the ratio of the probability that the known mother and the putative father would

---

[2]Terasaki, *Resolution by HLA Testing of 1000 Paternity Cases Not Excluded by ABO Testing* (1978) 16 J. Fam. L. 543.

produce a child with the given genetic markers to the sum of such probabilities for the putative father and "a hypothetical man who is assumed to be random with respect to serologic genotypes and unrelated to the putative father in question." (*Id.* at p. 549.) Of 1,000 disputed paternity cases in which such probability was determined, a zero probability was found in 25 percent of the cases, a 90 percent or greater probability was found in 64 percent of the cases, and the 10 percent of cases falling between 50 percent and 90 percent were characterized as "considered to be not resolvable" by the HLA testing. (*Id.*, at p. 552.) This evaluation corresponds to table 4 which appears in *Joint AMA-ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage* (1976) 10 Fam.L.Q. 247, 262, which correlates percentages of probability of paternity with likelihood of paternity, as follows:

"**Table 4**
**Verbal Predicates, According to Hummel (5) for Different
Likelihoods of Paternity (W), Comparing the
Phenotype Frequency of the Putative Father to That of
A Random Man With the Same Blood Group Phenotype**

| W | LIKELIHOOD OF PATERNITY |
|---|---|
| 99.80 - 99.90 | Practically proved |
| 99.1 - 99.75 | Extremely likely |
| 95 - 99 | Very likely |
| 90 - 95 | Likely |
| 80 - 90 | Undecided |
| < 80 | Not useful |

"

In an article entitled *The Legal Implications of HLA Testing for Paternity,* 16 J. Fam. L. (1978) page 537, the author notes, referring to such percentile probabilities, "This procedure is currently practiced by national blood labs in Oslo, Stockholm and Copenhagen, where results are reported to the court only if the probability is significantly high (above 95%) or low (less than 5%). [Fn. omitted.]" (*Id.*, at p. 540.)

It is, therefore, apparent that the reported probability of 85.95 percent with respect to defendant does little more than determine that he is not excluded as a possible father of the minor. It is totally indecisive and places him in the category of putative fathers whose parentage is "not resolvable." It is therefore

equally valid to infer therefrom that he is not the father as to infer that he is the father. Under such circumstances, this court is " 'without power to substitute its deductions for those of the trial court . . . .' " (*Callahan* v. *Gray* (1955) 44 Cal.2d 107, 111 [279 P.2d 963].) We must, therefore, affirm the judgment of dismissal.

The judgment is affirmed.

Lui, J., and Danielson, J., concurred.